W. GORDON KAUPP, State Bar No. 226141
BETH FEINBERG, State Bar No. 240857
KAUPP & FEINBERG, LLP
One Sansome Street, 35th Floor
San Francisco, California 94104
Telephone:   (415) 896-4588
Facsimile:    (415) 294-9127
E-Mail:        gordon@kauppfeinberg.com
                   beth@kauppfeinberg.com

Attorneys for Plaintiff
NATALIE ARNOLD

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATALIE ARNOLD,<br><br>        Plaintiff,<br><br>    vs.<br><br>JEFFERSON B. SESSIONS III in his official capacity as United States Attorney General,<br><br>        Defendant. | Case No. 18-cv-0553<br><br>**COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND DAMAGES**<br><br>**PLAINTIFF DEMANDS A TRIAL BY JURY** |

Plaintiff NATALIE ARNOLD ("Plaintiff"), by and through her attorneys, KAUPP & FEINBERG, LLP, on information and belief, hereby complains of the Defendant JEFFERSON B. SESSIONS III in his official capacity as the head of the United States Department of Justice, as follows:

**INTRODUCTION**

1. Plaintiff NATALIE ARNOLD brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, for damages, injunctive relief, and declaratory relief against Attorney General SESSIONS because she was discriminated against based on her sex, subjected to a sexually hostile work environment, and retaliated against for complaining about discrimination, a hostile work environment and retaliation.

**JURISDICTION AND VENUE**

2. This Court has jurisdiction under 42 U.S.C. §§ 2000e-16(c), 2000e-5, 2000e-3, and 28 U.S.C. § 1331.

3. This action involves a question of federal law.

4. Venue in this district is proper because the events giving rise to this action occurred within the County of San Francisco and the County of Alameda, which are located within the Northern District of California. 28 U.S.C. § 1391(b).

5. Plaintiff has exhausted her administrative remedies before the filing of this action. On or about April 19, 2017, Plaintiff initiated counseling with the Federal Bureau of Investigation ("FBI") Office of Equal Employment Opportunity Affairs ("EEOA"). 29 C.F.R. § 1614.105(a)(1). On May 30, 2017, Plaintiff submitted a formal complaint to the FBI EEOA. 29 C.F.R. §§ 1614.105(d). On July 12, 2017, Plaintiff submitted an amendment to her complaint of discrimination concerning conduct that occurred after the submission of her formal complaint, which had been accepted by the FBI EEOA for investigation.

6. More than 180 days has expired since the filing of Plaintiff's formal complaint of discrimination and no final agency action has been taken nor appeal made. As a result, Plaintiff's claims are timely filed. 29 C.F.R. § 1614.407(b).

7. Plaintiff will seek leave to amend this complaint to add additional claims concerning discrimination, hostile work environment and retaliation for conduct that has occurred since the issuance of the FBI EEOA's Report of Investigation ("ROI") once the administrative remedies concerning those claims have been exhausted.

**INTRADISTRICT ASSIGNMENT**

8. This action shall be assigned to the United States District Court sitting in San Francisco or Oakland, California. See, Civil L.R. 3-2(d).

**PARTIES**

9. Plaintiff NATALIE ARNOLD is a woman and a resident of the State of California. At all times material, Plaintiff was employed by the FBI, an agency of the United States Department of Justice.

10. Defendant JEFFERSON B. SESSIONS III is the Attorney General for the United States.

## MATERIAL FACTUAL ALLEGATIONS

11. In 2010, Plaintiff was hired by the FBI. She became an FBI Special Agent ("SA") on or about April 11, 2010 and continues to work at the FBI through the present.

12. Plaintiff is, and at all times material was, assigned to the FBI's San Francisco Field Office, which includes seven resident agencies ("RAs") in Concord, Eureka/Fortuna, Monterey Bay, Oakland, Palo Alto, San Jose and Santa Rosa.

13. Plaintiff has a career goal of advancing to a position in Executive Management at the FBI. In order to achieve this goal, Plaintiff needs to demonstrate that she has diverse experience and has worked in a range of squads throughout the FBI. Plaintiff will not be a viable candidate without receiving high ratings in her annual performance evaluations. Performance evaluations are based in part on the objective analysis of an agent through the accumulation of "accomplishment statistics," which are markers of her having completed key FBI duties. For example, accomplishment statistics are acquired by serving subpoenas, conducting surveillance, making an arrest, executing a search warrant, or conducting an interview.

14. Plaintiff worked in counterterrorism squads from approximately February 2011 to November 2016, first in Squad CT-5 (for approximately seven months), and then in Squad CT-3 for nearly five and a half years. Plaintiff has received exemplary performance evaluations throughout her time at the FBI, and she received the highest possible rating – "Outstanding" – on her two most recent evaluations.

15. In late 2016, Plaintiff requested a transfer from counterterrorism to a criminal squad in order to broaden her experience and work toward her goal of eventually obtaining an Executive Management position. In November 2016, Plaintiff was transferred out of Squad CT-3 and assigned to Squad C-1, which is a criminal squad located in the San Francisco Field Office.

16. Plaintiff's direct supervisor on Squad C-1 was Thinh Nguyen, a Supervisory Special Agent ("SSA"). SSA Nguyen's supervisor was Administrative Special Agent in Charge ("ASAC") Bertram Fairries, who had managerial oversight over the Criminal Program Branch II, which includes Squad C-1. ASAC Fairries was also Plaintiff's "second-line supervisor" and "reviewing official."

3

COMPLAINT
*Natalie Arnold v Jefferson B. Sessions III*

17. On or about November 16, 2016, and prior to reporting to Squad C-1, Plaintiff attended an after-hours "Happy Hour" social event with members of Squad C-1. At the happy hour, Plaintiff met SSA Nguyen and was eager to tell him about her background and prior casework. However, SSA Nguyen was primarily interested in whether Plaintiff could tolerate a "non-PC" (non-politically correct) squad. SSA Nguyen repeatedly made inquiries about Plaintiff's "sensitivity" and asked if she was "easily offended." SSA Nguyen informed Plaintiff that it would not work out for her on Squad C-1 if she was easily offended. On or about November 28, 2016, a male special agent in Squad C-1 also asked Plaintiff whether she was sensitive and warned her that Squad C-1 has "sharp elbows."

18. Upon joining Squad C-1, Plaintiff was treated less favorably than the male special agents on her squad. Despite having nearly seven years of experience as an SA when she joined the squad, Plaintiff was treated like a rookie agent and assigned largely administrative tasks. She was consistently denied substantive work on active investigations and was instead frequently assigned as the "Case Manager" on inactive cases that were effectively closed and only required menial administrative work. Not only did this deny Plaintiff the ability to gain valuable experience, it also denied her the ability to earn accomplishment statistics. By contrast, the male SAs on Squad C-1 were consistently assigned substantive work on active investigations.

19. For example, in preparing for a trip to New York with a male special agent on Squad C-1 (SA Manuel Pascua), Plaintiff was assigned to book hotel rooms and pack their supplies while SA Pascua did the substantive preparations for the trip. Once in New York, when an arrest needed to be made, SA Pascua purposefully asked a male agent from a different squad to make the arrest rather than Plaintiff, who had accompanied SA Pascua on this assignment and should have been the agent to perform that duty. In addition, SA Pascua informed Plaintiff that she reminded him of his girlfriend because Plaintiff was "always on him" and "nagging him." SA Pascua began referring to Plaintiff as his "work wife." After this trip, a male special agent on Squad C-1 began asking Plaintiff about her experiences with SA Pascua, who he and other male agents referred to as "Creepy Manny," "Creeper," and "Creepy Uncle," because, as he told Plaintiff, SA Pascua was known for making sexual advances on women.

4

20. By way of further example of the differential treatment of Plaintiff because she is a woman, when Plaintiff and another female agent (with seven and ten years' experience respectively) were preparing to go out on an investigation, a male special agent on Squad C-1 (who himself had only two or three years of experience) repeatedly insisted that the two female special agents needed backup because they were going into a "dangerous neighborhood."

21. As yet another example, when SSA Nguyen finally assigned Plaintiff an active case (after Plaintiff had been on Squad C-1 for over two months), it was a walk-in complaint from a person that SSA Nguyen knew was seriously mentally ill and had no actionable intelligence, and therefore there was no substantive work for Plaintiff to do.

22. Not only was Plaintiff's treatment offensive and discriminatory on a day to day basis, it also denied her valuable experience and prevented her from earning the accomplishment statistics that come with completing substantive assignments. Even on the one active case to which Plaintiff was assigned, she was given the title of "Co-Case Agent," which was an assistant position for which she received fewer accomplishment statistics than the male Case Agent assigned to the same case.

23. Once Plaintiff realized that most of the substantive work on active cases was being assigned to the male special agents on her squad, she began searching for other active investigations that had not recently been worked on due to their lower priority levels. Plaintiff believed that she could do work that was not otherwise being done since these investigations, although active, were effectively dormant. However, Plaintiff was actively prevented from doing substantive work even on those cases and any attempts she made were consistently undermined.

24. For example, on one such case, Plaintiff identified an informant who she should speak to but had to go through a male special agent on her squad to gain access to him. The male special agent first unnecessarily delayed arranging the meeting with the informant. Then, when the meeting with the informant took place, the male special agent led the interview, mainly asking the informant questions about another matter. The special agent permitted Plaintiff to ask some questions but when Plaintiff asked an important question, the male special agent instructed the informant not to answer it. The male special agent then continued to only ask questions about his case for the remainder of the interview, which prevented Plaintiff from making progress with her investigation.

5

25. In addition to being denied substantive work and the ability to earn accomplishment statistics as well as having her work on Squad C-1 undermined, Plaintiff also endured a sexually hostile work environment due to the conduct of her direct supervisor, SSA Nguyen, and other male agents on Squad C-1. The following are just some examples of the conduct of the male special agents on Squad C-1 that created a sexually hostile work environment for Plaintiff:

- After the 2016 Presidential Election, it was common for male special agents on Squad C-1 to say "grab them by the pussy;"
- On the day of President Trump's inauguration, a male special agent on Squad C-1 stated, "Well, I guess we can start grabbing women by the pussy now;"
- On another occasion around the time of President Trump's inauguration, while Plaintiff was speaking with a male special agent, he interrupted Plaintiff and blurted out, "Grabbing them by the pussy;"
- Plaintiff's direct supervisor told Plaintiff that his family tried to dissuade him from marrying his wife because she had "big tits," as he made a gesture with both hands in front of his body attempting to depict large breasts, and that his family thought it meant she would cause him trouble. Plaintiff's supervisor then laughed and said that he told his family, "Well, why do you think I'm marrying her;"
- Male special agents on Squad C-1 openly mocked the antidiscrimination laws by regularly declaring, "45 days" (the amount of time an FBI employee has to initiate a complaint of discrimination to an EEO counselor[1]) after engaging in sexually inappropriate and offensive conduct;
- A male special agent on Squad C-1 repeatedly flirted with a female witness throughout an interview. After the interview, the special agent repeatedly remarked that he found the witness attractive, began referring to her as his girlfriend, and passed the witness's Department of Motor Vehicles ("DMV") photograph around so that other male agents

---

[1] See, 29 C.F.R. § 1614.105(a)(1).

6

could determine whether she was attractive. SSA Nguyen was present but failed to intervene in any way;

- Male special agents on Squad C-1 repeatedly referred to the only other female special agent on Squad C-1 (other than Plaintiff) as "Fat Sarah" because she was pregnant;
- While Plaintiff was in the C-1 squad room, a male special agent was talking about women in Playboy Magazine. When the male agent saw Plaintiff, his voice dropped. After Plaintiff sat down at her desk, the special agent and the male agents from Squad C-1 he was speaking to erupted into laughter;
- Plaintiff's direct supervisor and several male special agents circulated an email concerning an office lunch that made repeated inappropriate comments of a sexual nature;
- A male agent on C-1 repeatedly referred to a female staff member as "sassy pants" because she repeatedly opposed sexist remarks or treatment;
- Male special agents on Squad C-1 frequently pretended to be gay and to be sexually interested in each other by speaking with a lisp, pawing at each other, and grinding their pelvises on each other's bodies in the squad area; and
- On Squad C-1, there was repeated joking and teasing about who agents or staff members were sexually interested in.

26. On or about January 25, 2017, Plaintiff told SSA Nguyen that she wanted to leave Squad C-1 because she felt that it was a hostile environment. SSA Nguyen told Plaintiff he would discuss it with ASAC Fairries. Plaintiff was intentionally vague and did not discuss the sexual harassment and sexual discrimination with SSA Nguyen because he had participated in, encouraged, and fostered the sexually inappropriate conduct and had taken no action to ensure she was able to perform substantive case work like the male agents on her squad. Plaintiff had also not previously complained to SSA Nguyen because she feared retaliation. Plaintiff interpreted her very first conversation with SSA Nguyen in November 2016, in which he asked her whether she was sensitive and easily offended, as a warning to her not to make such complaints.

7

27. On or about February 3, 2017, less than two weeks after Plaintiff complained to SSA Nguyen about Squad C-1 and requested to be transferred, she was subjected to discipline with a Letter of Censure by ASAC Fairries. The Letter of Censure was for violating the "Consensual Sexual Contact" policy contained in the FBI Offense Codes and Penalty Guidelines for holding hands with her boyfriend (who was a Special Agent in a different squad), even though that policy prohibits sexual activity, not public hand holding. This disciplinary action was administered without following FBI policies and procedures, did not comport with basic notions of fairness, and was without merit. Plaintiff was not provided with any materials detailing the allegations to review; Plaintiff was not informed of the allegations in advance of the meeting; Plaintiff was not interviewed as part of the required investigation; a separate, impartial supervisor was not provided; Plaintiff was not given an opportunity to appeal the decision; and one of the investigators was himself a witness.

28. On or about February 23, 2017, Plaintiff complained to SSA Nguyen that she wanted to perform substantive work on active investigations but, despite her best efforts, was being prevented and thwarted from doing so. SSA Nguyen responded that this was due to a generally low workload on the squad. However, Plaintiff could plainly see that the male special agents on the squad, including one who had joined the squad after Plaintiff and was right out of the FBI Academy, were doing a lot of substantive work. SSA Nguyen dismissed Plaintiff's concerns and took no action to ensure that Plaintiff received substantive work like the male special agents on her squad.

29. On March 1, 2017, Plaintiff complained to Special Agent in Charge ("SAC") for San Francisco, John "Jack" Bennett, about the sexually inappropriate conduct on Squad C-1 and the sex-based discrimination she experienced. Plaintiff told SAC Bennett that the Letter of Censure she received had been issued without following proper procedures and that she was shocked that she had been disciplined for hand holding given the conduct she is subjected to on Squad C-1. SAC Bennett immediately interjected and said words to the effect of, "I know exactly what you're talking about. I have a wife and daughter. I do not agree with women being treated like that." SAC Bennett also said that he found it unacceptable and that he would "take care of it," or words to that effect.

30. SAC Bennett then quickly turned the conversation to finding a new squad for Plaintiff and asked Plaintiff what she wanted to do. Plaintiff responded that she wanted to work violent crime matters and be assigned to a squad such as Violent Crimes or Gangs and Drugs (Squad C-9) because she needed that type of diverse experience in order to one day advance into Executive Management. SAC Bennett responded that he was concerned about Plaintiff working with the "guys" on Squad C-9 because of the "romper room" environment there. SAC Bennett referenced the "romper room" atmosphere on Squad C-9 twice when explaining that he thought it was a bad fit for Plaintiff.

31. As SAC Bennett and Plaintiff continued to discuss her placement, SAC Bennett kept directing Plaintiff away from grittier street assignments (where she would obtain the diverse experience she sought). Instead, SAC Bennett only suggested assigning Plaintiff to administrative positions or positions generally assigned to rookie agents or poorly performing agents, which would only serve to impede Plaintiff's career advancement.

32. Despite Plaintiff's seven-year exemplary record as a Special Agent, after her complaint to SAC Bennett she was assigned back-to-back temporary assignments (called "TDYs") that were predominantly administrative in nature. These positions were de facto demotions that sent a message to Plaintiff and other women in the FBI that if they complained about discrimination or sexual harassment, they would be retaliated against by having their careers derailed and their reputations ruined, which is what has happened to Plaintiff. As a result, Plaintiff's potential for career advancement in the FBI has been thwarted.

33. On March 14, 2017, Plaintiff met with SAC Bennett a second time. SAC Bennett proposed making Plaintiff the new Fugitive Coordinator for the San Francisco Division, which was largely an administrative position that did not involve any field work. Plaintiff would not gain the diverse experience she needed to advance her career. Plaintiff would also not be able to earn even close to the same level of accomplishment statistics as she would on a squad that does active fieldwork that includes tasks such as interviews, surveillance, or serving search or arrest warrants. Plaintiff again explained to SAC Bennett that she wanted criminal case work so that she could gain diverse experience, such as testifying before a Grand Jury, writing search warrants, and being involved with trials, and that she was interested in working with the Oakland Homicide Task Force.

9

COMPLAINT
*Natalie Arnold v Jefferson B. Sessions III*

34. SAC Bennett informed Plaintiff that she would not be returning to Squad C-1 and that he was assigning her to a two-week administrative TDY beginning on March 14, 2017 while he considered what squad she would go to next. SAC Bennett informed Plaintiff that she would be supervised by Administrative ASAC Marina Mayo (who is a woman), and that ASAC Mayo had a number of other administrative assignments for Plaintiff beyond the initial two-week TDY.

35. SAC Bennett's assignment of Plaintiff to an administrative TDY instead of a permanent squad was widely viewed as a punishment and sent a clear message that Plaintiff had done something wrong and accordingly had been demoted from a permanent position on a criminal squad to a temporary administrative position. An FBI Special Agent's reputation is very important. A negative reputation could have serious negative consequences for that agent's career.

36. On or about April 4, 2017, Plaintiff met with SAC Bennett and ASAC Mayo. SAC Bennett told Plaintiff that he was concerned about any "further tarnishing of [her] record." SAC Bennett told Plaintiff she would be the new Fugitive Coordinator, that she would be overseeing the entire Fugitive Program, and that she could go as far as she wanted to with the position.

37. Plaintiff's Fugitive Coordinator assignment was a de facto demotion from her previous position as an SA on a criminal squad because it was largely administrative in nature and offered her almost no opportunity to gain the type of diverse experience that would advance her career. This assignment was an act of retaliation taken in response to her complaint of a hostile work environment, intended to destroy her reputation and derail her career in the FBI. As detailed below, this was followed by a deliberate and concerted effort to try to ensure that Plaintiff would not be successful even in her administrative role.

38. SAC Bennett's assurance that Plaintiff would be overseeing the Fugitive Program and could determine the scope of the position was quickly proven not to be true. Instead, Plaintiff continued to be treated like a rookie agent and/or a poorly performing agent because she is a woman and/or in retaliation for her complaint of sex-based discrimination. Plaintiff also continued to be denied the opportunity to perform substantive investigative work in her new position.

39. At least two times during that meeting, SAC Bennett told Plaintiff that she would be reporting to ASAC Mayo because, in light of her complaint, he wanted to keep Plaintiff away from

10

male supervisors and only wanted her reporting to a woman. Given the very low number of women at the FBI (and even more so in the positions of SSA and ASAC), this effectively prevented Plaintiff from being assigned to the units that she was most interested in and that had the most potential for career advancement.

40. For the first ten days on Plaintiff's new assignment, from approximately April 4-14, 2017, Plaintiff had multiple meetings in which ASAC Mayo encouraged her to take a global look at fugitive issues as it was a Division-wide problem. However, soon after these initial conversations, Plaintiff's role became severely restricted and she continued to be treated like a rookie agent or a poorly performing agent because of her sex and/or in retaliation for her complaints of sex-based discrimination.

41. On or about April 14, 2017, ASAC Fairries handed Plaintiff a file entitled "Welcome to Fugitive Investigations," and told Plaintiff that there were very specific duties he wanted her to perform as the Fugitive Coordinator that were set out by SSA Matthew Beaupain, the male supervisor of Squad C-2. ASAC Fairries informed Plaintiff that her focus would only be on Criminal Branch II and that she would be working with SA Glenn Solomon-Hill, but warned Plaintiff that SA Solomon-Hill was not in fact Plaintiff's partner and that she was required to report to him. SA Solomon-Hill was subsequently designated as Plaintiff's "Training Agent" despite the fact that Training Agents are generally only assigned to recent graduates of the Academy and not to agents with over seven years of experience such as Plaintiff.

42. Although SAC Bennett had stated that he wanted to keep Plaintiff away from male supervisors, she was now assigned two male supervisors: SA Solomon-Hill and SSA Beaupain. In addition, Plaintiff was directed to submit weekly updates to SAC Bennett, ASAC Fairries, and ASAC Stacey Moy (the ASAC for Criminal Branch I), all of whom are male, as well as to ASAC Mayo. Plaintiff now had six supervisors to report to, five of whom were men.

43. When Plaintiff met with SSA Beaupain, he told Plaintiff that he did not know what happened on Squad C-1 but that it obviously was not good because of Plaintiff's current placement. SSA Beaupain told Plaintiff that he was used to getting the "problem children" because they knew he could turn them around. Plaintiff informed SSA Beaupain that she had not done anything wrong, that

11

she had requested a transfer off of Squad C-1 because of the sexism, that there was a lot of inappropriate behavior, and that she could not tolerate it any longer. SSA Beaupain told Plaintiff that he did not want to hear any more about it because he did not want to be a witness.

44. On or about April 15, 2017, SAC Bennett gave his approval to restricting Plaintiff's role as Fugitive Coordinator - she would now be focusing on five fugitive cases in Criminal Branch II and SA Solomon-Hill would be her Training Agent. This was a significant departure from the Fugitive Coordinator role originally described by SAC Bennett and ASAC Mayo. SA Solomon-Hill confirmed this in an email to Plaintiff on or about April 20, 2017, in which he instructed her that she would only be working on five cases and would not be looking at the Division's cases as a whole, as SAC Bennett and ASAC Mayo had previously indicated.

45. On or about April 20, 2017, Plaintiff sent an e-mail to SAC Bennett complaining that she had been subjected to retaliation since complaining to him on March 1, 2017 about the sex-based discrimination and sexually hostile work environment on Squad C-1. Plaintiff described how she has been ostracized, repeatedly informed that she now has a bad reputation, that she has been limited to where she could transfer because of sexually inappropriate behavior on other squads, that she has been effectively demoted into a position for rookie agents, and that she was now forced to fight for her career. Plaintiff also complained that the treatment to which she has been subjected sent a clear message to her and other women that if they complained about sex discrimination or sexual harassment, they would be punished and have their reputations ruined. Plaintiff also wrote that she hoped her e-mail would reverse the course of events and help save her career. SAC Bennett failed to take any prompt corrective action.

46. On or about April 24, 2017, SAC Bennett held a meeting with Plaintiff and ASAC Mayo. During the meeting, Plaintiff reiterated that she had been subjected to a sexually hostile work environment and discriminated against while working in Squad C-1. Plaintiff also complained that she had been subjected to retaliation since her complaint to him through damage to her reputation, being given administrative assignments, having been reduced to a "trainee," and having her career derailed. Plaintiff also informed them that she had complained to SSA Nguyen but it did not help. SAC Bennett informed Plaintiff that he wanted her to only work with a female supervisor and that it

12

was for her benefit. Plaintiff told SAC Bennett that such a restriction would severely limit her career because there were so few female supervisors in the Division. Plaintiff further stated that she wanted to be reassigned to a criminal squad. SAC Bennett informed her that that would not be possible. After their meeting, SAC Bennett failed to take any prompt corrective action.

47. After the meeting, Plaintiff asked ASAC Mayo if an investigation into the sexual harassment and discrimination would be initiated. ASAC Mayo responded that she did not know but said she would ask SAC Bennett. ASAC Mayo did not follow up with Plaintiff nor has Plaintiff been contacted by OPR for an interview.

48. During Plaintiff's assignment as Fugitive Coordinator, she continued to be treated like a rookie agent or a poorly performing agent. For example, junior staff were told to instruct Plaintiff on basic tasks such as conducting a background check (something Plaintiff learned in the Academy or shortly thereafter), she was denied the fugitive list for the San Francisco Field Office, she was initially denied (in a humiliating manner) being able to take files, and she was restricted to conducting a case review on four cases with access to a fifth case as an exemplar.

49. On or about May 2, 2017, Plaintiff's roles and responsibilities were restricted even further. Plaintiff was instructed that she would no longer be assigned the five cases and instead would be given one "dog case." The "dog case" was approximately 15 years old and no one had worked on it for approximately 12 years.

50. Once again, Plaintiff's ability to perform substantive work, gain experience, or be successful was being undermined. Even on the "dog case" to which Plaintiff was assigned, she was not designated the "Case Manager" and was thereby prevented from earning accomplishment statistics for her work. Although she complained about this to SA Solomon-Hill on or about May 3, 2017, no prompt corrective action was taken.

51. On or about May 3, 2017, Plaintiff again complained to ASAC Mayo about her treatment and complained that it was because of her sex and/or because of her complaints of sex-based discrimination. Plaintiff also informed ASAC Mayo that SA Solomon-Hill was preventing her from becoming a Case Manager on the fugitive investigations and argued the importance of being assigned as such on her cases. Once again, no prompt corrective action was taken.

52. Within two days of being assigned the "dog case," Plaintiff spoke with an Assistant Legal Attache ("ALAT") who was abroad in the country where the fugitive (who was the subject of Plaintiff's case) was believed to be and who expressed interest in putting resources into locating the fugitive and extraditing him. In addition, Plaintiff spoke to local law enforcement (who had jurisdiction over the criminal case in California) and began to discuss collaboration on the local side of the case. However, as soon as SA Solomon-Hill saw that Plaintiff was making progress with the case he told Plaintiff that it was his case and instructed her to stop all communication with local law enforcement and with the agent abroad. Once again, as with her experience on Squad C-1, Plaintiff's ability to perform substantive work was undermined.

53. On or about May 5, 2017, Plaintiff sent another weekly update to SAC Bennett and ASAC Mayo describing her roles and responsibilities, which continued to be greatly restricted. Plaintiff also reported the progress she had begun to make on the "dog case" and how her work was abruptly curtailed. In response, SAC Bennett stated "great progress" and said he would discuss the issue with ASAC Mayo. That same day, Plaintiff sent another e-mail to ASAC Mayo complaining about her treatment as it related to the "dog case." No prompt corrective action was taken.

54. On May 8, 2017, ASAC Mayo sent Plaintiff an e-mail that stated in part, "As I understand you, you see the assignment of a case manager as an effective way to give you investigative authority, autonomy and progress tracking." That same day ASAC Mayo also wrote," I 100% agree on the importance of you, as a case agent, to manage the division's cases on fugitives." ASAC Mayo said she was discussing the situation with Executive Management.

55. On or about May 10, 2017, ASAC Mayo told Plaintiff she could continue to work on the "dog case." However, two days later, ASAC Mayo told Plaintiff, without explanation, that – "effective immediately" – she could no longer work on any case in Criminal Branch II, including the "dog case." This decision was made by ASAC Fairries with SAC Bennett's concurrence.

56. Plaintiff was directed away from fugitive cases in Criminal Branch II (the branch with the most fugitive cases in San Francisco) and was told to reach out to Squad C-10 in the Santa Rosa Resident Agency for fugitive cases. Although the majority of fugitive cases are located in Criminal

14

COMPLAINT
*Natalie Arnold v Jefferson B. Sessions III*

Branch II, Plaintiff had now been banned, with no reason provided and despite the progress she was making on her investigation, from working on any fugitive cases in that branch.

57. Plaintiff was assigned five cases from Criminal Branch I from Squad C-10 in Santa Rosa. These were Pending Inactive, which meant that they were cold cases that were the least likely to have successful resolution with the exception of one case that did not even have a federal warrant, which meant the case should have been closed. Plaintiff still held the title of Fugitive Coordinator for the entire San Francisco Field Office; however, the extreme restrictions placed on the scope of her work undermined her ability to successfully perform her job.

58. On or about May 12, 2017, Plaintiff again complained to ASAC Mayo that she was being subjected to discrimination and/or retaliation. That same day, Plaintiff informed SAC Bennett about her restriction to Criminal Branch I. Plaintiff received no response. No prompt corrective action was taken.

59. On or about June 7, 2017, in a meeting with SAC Bennett and ASAC Mayo, Plaintiff was informed that she would no longer be the Fugitive Coordinator for the San Francisco Field Office because the ASACs of the different Branches wanted their agents to handle the fugitive cases. However, previously under that system, many fugitive cases had been dormant with no active work performed on them for multiple years. By contrast, even during the brief period that Plaintiff was Fugitive Coordinator, she had actually made progress on some of those dormant cases despite the obstacles placed in her way.

60. During the June 7, 2017 meeting with SAC Bennett, in response to questions about where she wanted to be assigned, Plaintiff reiterated her request to be assigned to a criminal squad so that she could broaden her experience as an agent, which would make her a more viable and competitive candidate for a position in Executive Management in the future. SAC Bennett informed Plaintiff that she would not be assigned to a squad in the Criminal Branch and that her only choices were the counterintelligence squad ("CI"), the counterterrorism squad ("CT"), or the surveillance squad ("SOG"). The CT and CI squads were materially similar to the work she had already performed for seven years and the SOG squad would not give her the experience she needed to advance her career at the FBI.

15

61. On or about June 22, 2017, given her limited choices, Plaintiff requested that she be assigned to a squad in the CI Branch. Plaintiff reiterated to ASAC Mayo that she wanted to be assigned to a squad in the Criminal Branch to broaden her experience and skill set to make her a more viable candidate for a future position in Executive Management. Plaintiff further reiterated that because she was returning to National Security work, it would only serve to stall her career and diminish her chance of advancing into an executive position within the FBI. Plaintiff requested that she be considered for any positions that opened in the Criminal Branch in the coming days, weeks, months or years.

62. Plaintiff also complained to ASAC Mayo about the ongoing sex-based discrimination and retaliation. She reiterated to ASAC Mayo that even despite her stellar record in the FBI, she continued to be denied opportunities to advance that male agents with similar (or less) experience and training are given. Plaintiff further complained about the back-to-back administrative assignments, the rumors being repeated back to her that she has a bad reputation or that she must have done something wrong to be in the position she was in, and about the fact that it is clear that she is being punished, which sends a message to her and other female agents not to complain about discrimination or retaliation. In response to Plaintiff's complaints, no prompt corrective action was taken.

63. On or about June 30, 2017, Plaintiff was informed that she would be assigned to a counterintelligence squad (Squad CI-2)

64. Despite Plaintiff's numerous complaints of a sexually hostile work environment, sex-based discrimination, and retaliation, including to SAC Bennett, there was no investigation into Plaintiff's allegations or any other prompt corrective action.

65. By failing to take prompt and effective corrective action, Defendant allowed the effects of the discriminatory conduct to permeate Plaintiff's work environment, thereby ratifying the discriminatory conducting and further subjecting Plaintiff to a hostile work environment.

66. Because Defendant failed and continues to fail to take prompt and effective corrective action after receiving complaints of discrimination such as Plaintiff's, it has engaged in a pattern and practice of failing to take all reasonable steps to prevent discrimination.

67. As a result of Defendant's discriminatory and retaliatory treatment of Plaintiff, she suffered, and continues to suffer, severe emotional distress, inconvenience, and loss of enjoyment of life.

68. As a result of Defendant's discriminatory and retaliatory conduct, Plaintiff has suffered and will continue to suffer the loss of income, salary, bonuses, and benefits, as well as the loss of career opportunities.

69. Plaintiff has also suffered additional pecuniary losses including, but not limited to, past and future medical and/or psychological treatment.

**AS A FIRST CAUSE OF ACTION**
**DISCRIMINATION BASED ON SEX**
**DISPARATE TREATMENT**
**42 U.S.C. § 2000e *et seq.***

70. Plaintiff repeats and realleges each and every paragraph as if fully set forth herein.

71. Plaintiff was discriminated against by Defendant because of her sex; Plaintiff's sex was a motivating factor for Defendant's discrimination; the discrimination resulted in an adverse employment action; Plaintiff was harmed; Defendant was the proximate cause of that harm.

72. Plaintiff was discriminated against because of her sex under 42 U.S.C. § 2000e *et seq.* and has suffered damages as a result, as set forth herein.

**AS A SECOND CAUSE OF ACTION**
**DISCRIMINATION BASED ON SEX**
**DISPARATE IMPACT**
**42 U.S.C. § 2000e *et seq.***

73. Plaintiff repeats and realleges each and every paragraph as if fully set forth herein.

74. Plaintiff was discriminated against by Defendant because of her sex; Defendant used an employment practice that had a significantly adverse or disproportionate impact on female employees; Defendant's employment practice resulted in the adverse action; and Plaintiff suffered harm as a result.

//
//
//

17

## AS A THIRD CAUSE OF ACTION
## HOSTILE WORK ENVIRONMENT
## 42 U.S.C. § 2000e *et seq.*

75. Plaintiff repeats and realleges each and every paragraph as if fully set forth herein.

76. Plaintiff was subjected to a sexually hostile work environment because she was subjected to conduct of a sexual nature; the conduct was unwelcome; the conduct was sufficiently severe or pervasive so as to alter the conditions of her employment and create a sexually hostile work environment; she perceived the working environment to be hostile; and a reasonable woman in Plaintiff's circumstances would consider the working environment to be hostile.

77. Plaintiff's supervisors created a sexually hostile work environment and knew or should have known about the sexually hostile work environment yet failed to take prompt and effective corrective action.

## AS A FOURTH CAUSE OF ACTION
## RETALIATION
## 42 U.S.C. § 2000e-3(a)

78. Plaintiff repeats and realleges each and every paragraph as if fully set forth herein.

79. Plaintiff participated in an activity protected under federal law by opposing or complaining about discrimination, hostile work environment and retaliation; Defendant subjected Plaintiff to an adverse employment action; and Plaintiff was subjected to an adverse employment action because of her participation in protected activity. An action constitutes an adverse employment action if the action might have dissuaded a reasonable employee from making or supporting a complaint of discrimination.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests a judgment against Defendants, as follows:

1. Declaring that Defendant discriminated against Plaintiff because of her sex, subjected Plaintiff to a hostile work environment, and retaliated against Plaintiff for engaging in protected activity;

2. Granting Plaintiff injunctive relief as appropriate;

3. Awarding Plaintiff compensatory damages;

4. Awarding Plaintiff costs of suit and attorney's fees; and

5. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy Defendant's unlawful conduct.

**JURY TRIAL DEMAND**

Plaintiff demands a trial by jury on all issues.

DATED: January 25, 2018                                    **KAUPP & FEINBERG, LLP**

                                                By:    */s/ W. Gordon Kaupp*
                                                       W. Gordon Kaupp, Esq.
                                                       Beth Feinberg, Esq.
                                                       *Attorneys for Plaintiff*
                                                       NATALIE ARNOLD